3239 McCarthy v. Intl. Boundary & Water Commission Paula Dinerstein, Public Employees for Environmental Responsibility, or PIRR for short. And with me is Catherine Douglas, also an attorney with PIRR. And we're representing the petitioner, Robert McCarthy. This case concerns the removal of the general counsel of the IBWC because of legal memos disclosing waste, fraud, abuse, and illegal activity which were deemed not constructive and collegial. This case involves egregious government misconduct, not only in the whistleblower retaliation itself, but in the fabrication of evidence to defend it. Mr. McCarthy was attempting to address the structure and function of an agency which had twice been found by the State Department Inspector General to be so mismanaged and dysfunctional that it was in danger of failing its mission entirely. Mr. McCarthy's recommendations were concurred in, several of them by the State Department and other agencies, and in fact the agency implemented the recommendations in the four memos that he was hired on. Are you arguing that he was discharged because of his external disclosures, or are you arguing that the discharge was motivated by his internal memos? He was discharged after his external disclosures and because of the external disclosures. However, the case law that we pointed out in our brief board case law, the cases of Mauser and Thompson, point out that if an employee is making internal disclosures, which his management fears may subsequently be made outside, he has whistleblower protection, even if he never makes them externally. Now in this case, Mr. McCarthy did make them externally, and we submit that he was fired because of his external disclosures, but even if he hadn't made them externally and only... So hypothetically, if he had been fired on July 27th and he walked down the street on July 28th and made these whistleblowing disclosures, so if he had already been discharged, you're suggesting that even under those circumstances he might be a whistleblower engaging in protection? We are suggesting that, but you need not reach that in this case because he was fired after his external disclosures. Did you make that argument below? Yes. Well, we made it in our brief, yes. You made it in your brief here, but did you make the argument below? I believe below we made the argument that he was fired based on the content of his legal memos, and that content was the same content that was later in his external disclosures, and that cannot qualify as an independent, non-retaliatory reason. So there's no way here that the agency could possibly meet its burden of clear and convincing evidence that it fired McCarthy for a non-retaliatory reason separate from the whistleblower disclosures because the reasons they fired him are inextricably intertwined with his whistleblower disclosures, regardless of when the timing of things were. I don't know. Well, I'm unclear on what you're saying. You're suggesting that if there's a link between what he ultimately disclosed and what he didn't, that automatically then you can never fire someone because you think that – I mean, I'm not clear on what you're saying. I thought you started off by saying that he could have been firing him because the supervisor anticipated or thought that they might – well, how does one prove that? I mean, who has the burden of proving what in that regard in terms of whether or not he – I didn't see that as an element of this case, that even if he had made the decision to fire him beforehand, it wouldn't be all right because he clearly feared or knew somehow that there was going to be a disclosure of the information. Well, as I said, that's not a crucial element of this case because he was fired after his external disclosures. But it seems to me it's quite critical because I think a lot of what the board said and I think what the argument of the government is is that the AJ did make a critical credibility determination that the supervisor had determined to fire him before the disclosure. So it's kind of the variation of the case. Right. Well, let me address that then. The claim that Mr. Ruth, the commissioner, had decided to fire McCarthy prior to his external disclosures, first of all, it depends on evidence, some of which is fabricated and backdated, that says that – that supposedly reflects that Mr. Ruth was thinking about firing him earlier. However, Mr. Ruth himself testified that he decided to fire McCarthy the day before his disclosures, which was after all of these documents they're relying on. So the agency could not have been, as the government says, trying to put in motion his removal when it hadn't even been decided yet. Another factor on this is that Mr. Ruth approved Mr. McCarthy's leave for the first week in August. He was fired on July 31st to move his family from California where his wife would be leaving her job. He wouldn't have done that if he had been planning on firing McCarthy. When did he approve that leave? He approved that leave, I don't know the exact date, but sometime in July Mr. McCarthy said, you know, I want to – he hadn't yet moved his family. Sometime in July covers a multitude of sins, so to speak, here. The critical time was that last week in July. Right, but he never – he knew that Mr. McCarthy was moving his wife and that his wife was leaving her job, and he never said, you know, don't bother, you're going to be fired. And he in fact did move his wife, and she did lose her job. Right, but the significance of that might be very different if it occurred on the 1st of July as opposed to the 28th, let's say. Right? Or 27th. Well, it may, but then again, as I said, he never withdrew that permission for leave. Also, his testimony that he made the decision on the 27th, the day before the external disclosures, is not supported by any documentation or any other testimony that he told anybody that. It's just something inside his head that you have to look at his credibility  that we've pointed out in our brief, and because – Well, the problem is we don't have the same opportunity as the administrative judge to look at his credibility. You don't have the – Credibility determination was based on demeanor and other factors. Right, you don't have the opportunity to observe his demeanor, but you do have the opportunity to look at the self-contradictions in his testimony, and also to look at how the documents contradict what he testified to. What document contradicts that he made the decision on the 27th? What document contradicts that he made the decision on the 27th? Well, the evidence as a whole, there's no particular support for the fact that he made the decision at that time. The fact that the agency had to fabricate documents to show this prior intent I think is very strong evidence that there was none. For example, there's a document that the agency introduced to show the prior intent, which is a memo supposedly authored by – Dated the 23rd? Dated the 23rd, and the computer metadata shows that, in fact, it was first created on August 3rd after both the disclosure and the filing. His testimony and what the AJ credited was that he made the decision on the 27th. That's right. But what I'm saying is that they introduced evidence. First of all, they introduced evidence supposedly to show a prior intent, which was even earlier than what he testified to, so that doesn't make any sense. And secondly, the evidence was fraudulent. It was created after the firing. Okay. What else in terms of discrediting? Well, another example is that Mr. Ruth testified, I think, in an attempt that the AJ credited to show that Mr. McCarthy's legal opinions were wrong, to impugn his competence as legal counsel. That his opinion that the commissioner should be subject to advice and consent of the Senate was wrong and that he had consulted people at the State Department who told him it was wrong. Well, under cross-examination, he was shown a document and he was forced to admit that the State Department, in fact, agreed with McCarthy that he was subject to advice and consent of the Senate and had so recommended in the Inspector General's report. The Board ignored highly significant evidence detracting from its decision that there was clear and convincing evidence, and as this Court recently ruled in the Whitmore case, you can't have substantial evidence when you're ignoring serious, significant evidence which detracts from that result. Yeah, but that case was fundamentally different from this one. The Board here simply rejected certain evidence. In Whitmore, they excluded all consideration of it as irrelevant. That's very different than a situation in which they look at the evidence and weigh it differently than you would. Well, that did happen here. For example, in their consideration of the third car factor of whether non-whistleblowers were treated similarly, they completely ignored extensive evidence that two other high-level officials at the IDWC, Mr. Graff and Ms. Forty, engaged in conduct that was far worse than anything that Mr. McCarthy was accused of in terms of being non-collegial or divisive or unsupportive and had no sanctions whatsoever. And the Board simply just said there are no comparator employees when we had introduced extensive evidence that there were, and that that's an extremely important factor, as was stated in the Whitmore case, and possibly the most probative evidence as to whether the agency would have taken the same action if the person were not a whistleblower was completely ignored. But that's where there is no dispute but that the discharge determination was made immediately after the disclosures. Here the Board made a finding that the discharge determination was made prior to the disclosures. Doesn't that make that car factor less pertinent to the analysis? Well, I think that because in almost any whistleblower case, the agency is probably going to say, well, we had already made up our minds before the disclosure, just like the deciding official is going to deny he did it because of retaliation. That's why the car factors are there, so that you can go further than just a bald claim by the agency, which we've shown has a lot of countervailing evidence in the record that he did decide before, that you need to look at these other factors that give you a whole picture of the possible retaliatory motive and the credibility of those claims. Ms. Dindersheim, you're into your rebuttal time. Would you like to say that? I'd like to say one more thing quickly, and that is that the evidentiary and discovery abuses in this case alone require reversal and serious sanctions of the agency for fabricating and backdating evidence. I already mentioned that one memo that was backdated. Another example is that there's an SF-50 in the record that shows McCarthy as probationary and at will, and it has Mr. Petz, the head of HR Signature Stamp, on it. Mr. Petz testified that he never signed that document. But he testified that it was likely one of his subordinates that put it together and that it was just an error, didn't he? I mean, you kept calling that a fraudulent document, but he testified that somebody in his department probably just made a mistake and that it was later corrected. Right. He corrected it right away. And regardless of who created the document, the agency knew that he wasn't at will or probationary, and yet they submitted that document to support their case and not the later corrected document. So I'll save the rest of my time. Very well. Thank you, Mr. Goodman. Good morning, Your Honors. May it please the Court. The first thing to make clear is the only disclosures before this Court are those disclosures that Mr. McCarthy made to OSC. He presented and followed through with the administrative exhaustion procedures that Congress has established. And those are the disclosures on the 28th of July. Sorry, are you saying that they did not argue below that there was a fear that he was going to make those disclosures? And that he therefore followed into the case law that would make him a perceived whistleblower? That's correct, Your Honor. The only thing that they said are disclosures were the disclosures on the 28th. They didn't say the earlier memos qualify as disclosures. Or inchoate disclosures, so to speak. Exactly. They didn't make that argument. They could have said that. They would have had to do that under the statute. They would have had to present those to OSC and said, these are also disclosures. And then that would have been before the Board and then before this Court. But before this Court, at this stage of proceedings, the only disclosures are the disclosures of the 28th. So any argument that Mr. McCarthy makes now that his earlier memos would qualify as disclosures is not before this Court. And also those earlier memos don't qualify as disclosures because he's never even said that he had a reasonable belief that they demonstrated gross fraud or corruption or anything else. Those memos were his legal policy opinions, policy differences that he had with his colleagues. And he was flushing them out through memos. But isn't it true that many of the things in those memos do find their way into the ultimate disclosures? There's some overlap. Some of the specifics do ultimately find their way into disclosures. But it's important, as the questioning has already noted, the timing of this. The 28th is when he made his disclosures. And the Board found clear and convincing evidence that Commissioner Ruth decided to fire him before that. We agree. The ultimate decision on the part of Commissioner Ruth was on the 27th. He said it was the meeting on the 27th. After that, he said, enough's enough. I'm up to here with McCarthy. I'm ending it now. What the Board found is that that was the culmination of a long history of problems. And we agree with that as well. There's testimony. It's not just the credibility determination of Commissioner Ruth, though that would be enough on its own. Mr. Petz, Mr. Riera, and Ms. Brandt all also testified that Commissioner Ruth had, prior to that, approached Ms. Brandt and discussed how he was unhappy with the performance of Mr. McCarthy and unhappy with the divisiveness that was resulting from his actions. Mr. Petz, who Mr. McCarthy relies on most strongly, throughout his briefing, Mr. Petz said that Commissioner Ruth came to him on the 20th and said, how do I remove Mr. McCarthy? And Mr. Petz said, I'll find out for you. I'll get you a document. And that's when Mr. Petz emailed Mr. McCarthy and said, I've got this hypothetical I have a friend. Can I interrupt just because before our time runs out, I wanted to deal with the car factor discussion and what your friend on the other side pointed to, at least with respect to the board's pretty much failure to deal with the issue of treatment of similarly situated employees, right? Under statute, the only thing, yes, your short answer is yes. The longer answer is, under the statute, all the agency has to show is that they would have taken this action anyway. And the agency demonstrated, and that's what I was getting into, all the reasons, all the evidence the agency presented that Commissioner Ruth would have removed him anyway. That's the determining factor. The car factors are just a way of getting at that. So in most cases, we don't have such clear and convincing evidence. We don't have that the commissioner had already made that decision as acknowledged by the other side, was made on the 27th. We don't have that in most cases. So what the board has to do is look at the three car factors and weigh them all against each other. How likely was the agency to have removed him? Can I ask this? This is just my own edification. On page 40, when the board deals with this, they say they agree with the administrative judge that Riera, who was the appellant, identified as a comparable employee. Weren't there others that were discussed in terms of similarly situated employees? Why did the board just call out Riera? I don't know why the board just focused on Riera. The other employees, I think the real answer is, this is the agency's burden. The agency can present to support the conclusion that the agency would have taken this action anyway. The agency can put forth other similarly situated employees and say, see, we would have removed this person for the same thing, and we would have removed this person for the same thing. What the board found here is the agency didn't do that. The agency wasn't able to meet that burden. The agency didn't meet it. This isn't like the kind of comparative, compared to other people, analysis that takes place under Chapter 75. This is different because the ultimate question this goes towards is has the agency demonstrated that it would have taken this action. So Riera was the closest to that. But the reality is that his whole explanation, Ruth's whole explanation for why he did this discharge is that these memos were abusive, they were disrespectful of other employees, that it affected the overall nice operations of the office, which the kind of professional concerns didn't seem to be very nice at all in that office. But that was the point, and all of the comparators that Mr. McCarthy put forward were comparators who he says engaged in the same kind of abusive behavior. And yet the only one that either the AJ or the board look at is Riera, and it had to do with just writing that one particular memo. So Grab and 40 aren't even mentioned at all. Isn't that a failure? And doesn't that go directly to the heart of whether they really made that determination and would have discharged him for those reasons? It goes to the car factors. It doesn't go to whether the agency would have removed him anyway because it's immaterial. It's completely beside the point. It doesn't go to what the agency would have done with respect to anybody else. He presented some evidence that Grab and 40 did things that were similar in some respects to what he had done, and the agency didn't remove him. Okay, that is what it is. But that doesn't say anything to contradict that the commissioner had already decided that he was going to remove Mr. McCarthy. And the board didn't feel the need to get into this and didn't get into this, but there's a very big difference between the agency's counsel and the CAO and the compliance officer, who are in very different capacities. Commissioner Ruth specifically said that when he brought in McCarthy, he told McCarthy this was already an agency with some problems, as Your Honor points out. It wasn't all nice. And Commissioner Ruth testified that he perceived there were two different camps, and he wanted Mr. McCarthy to help him with this problem. And he perceived that Mr. McCarthy didn't help him with the problem, but in fact made it worse, because Mr. McCarthy chose his side and just joined in the battle rather than helping him bring everybody together. Can I just go back to your earlier response to Judge O'Malley's question, though? Is what you're saying that given the credibility and determination that he made the decision before he knew of the whistleblowing disclosures, it has absolutely no effect? Because even if he, for some arbitrary or ridiculous reason, had decided, even though McCarthy and several people did the same thing, that he was going to pick up McCarthy, what we know is it had nothing to do with his whistleblowing disclosures, because that decision was made before him. Yes, Your Honor. So the other two car factors, as we point out in our brief, are basically swallowed in this case because the statutory question has already been answered. The agency would have removed him, we know that. So the car factors are a way of answering that question, which we don't really have to get into here. Well, that depends on whether or not he was appropriately believed that the decision was made on July 27th. So that's another point, and the other side raises various arguments with respect to document changes and so forth that ought or should have, I guess, their position that it should have been used to discredit Mr. Ruth's testimony. They do make that argument. This isn't fabricated evidence. What this is, is Commissioner Ruth, as he testified… Are you talking about the July 23rd memo? The July 23rd and the July 20th, I think they also point to. They are at, during Appendix 6… I'm sorry, 560 and 561. These are Commissioner Ruth's notes, and on their face they weren't written on the date on them. On the first one it says, the last sentence is, Kevin later provided me the attached information. Well, that's not something that he wrote on July 20th. He's talking about something that happened after July 20th. These were not presented as, this is exactly written on July 20th. This is Commissioner Ruth's notes about what happened on July 20th and on July 23rd. So, he's asked later to document. You had a meeting with Pets on the 20th, write down what happened in that meeting. Then you met with McCarthy on the 23rd, write down what happened in that meeting. That's what these are. This isn't fraudulent or made-up evidence. Same thing with the SF-50. That was in Mr. McCarthy's record throughout the entirety of his being at the agency. Why did the agency try to argue that he was probationary when they knew that he was? Probationary is not the right term. He was serving in that initial two-year period where he didn't yet have permanent board rights. I understand that, but that's not the argument they made. They argued that he was probationary based on that incorrect SF-50. Isn't that right? Yes, I think it's a question of terminology. They used bad terminology. I have always found this concept of accepted service to be elusive. It does seem to me that the first two years, setting aside preference eligibles, the first two years of your accepted service, it isn't called probationary, but it sure looks, smells, and quacks like probation. Is it anything different? Practically speaking, no, because the agency can remove an employee during that time period for no reason at all. That raises another question in my mind. This was a removal which would fall, I gather, for inadequate performance under Chapter 43, rather than a disciplinary removal under 75? It would be a disciplinary under 75. Oh, you think? Yes. The commissioner said, in the letter, it says it was because of fostering this divisive relationship. It wasn't because he wasn't a good enough lawyer. It was because he caused hate and discontent with his colleagues. Okay. But there were issues that the board mentioned about his inadequate legal skills, right? The board discussed that it wasn't about him being a bad lawyer, and that wasn't what the agency was trying to show, and that's not what the board found. It was that Commissioner Ruth didn't trust him. That was what that was going to. Commissioner Ruth, earlier, had gone to Brandt and said, I don't trust him. I don't trust his legal advice. And that all goes to as evidence that Commissioner Ruth, in fact, would have removed him. It's not some kind of finding on the part of the board that he wasn't a very good lawyer. That was not what was found. It was just that Commissioner Ruth didn't believe all of his legal advice. So that just goes to an additional piece of evidence that Commissioner Ruth was telling the truth when he said that he made the decision on the 27th to remove him. And there was a lot of other testimony in the record from Petz and Riera saying the same thing. Petz met with Commissioner Ruth, and Commissioner Ruth came to him and said, how do I go about this? And that's the story I was getting into earlier, where Petz then went to McCarthy and said, how do we remove, hypothetically, an attorney in the accepted service? And McCarthy gave him a memo, which he then gave back to Commissioner Ruth. So the circumstantial evidence is that Mr. McCarthy was aware of his pending removal. And what about the wiping out of all these computers? Were we just supposed to believe that was coincidental in terms of the timing? The only evidence before this court at all is not before this court properly, and that's a declaration from an IT person of the agency from a FOIA proceeding that was not before the board and therefore is not before this court. But in that declaration, the individual says that there was the periodic writing over that happened in the computers. This is after the fact, one person going back and looking at what may have happened. The answer to all the questions about discovery in this case is that the agency withdrew all of its objections and said to Mr. McCarthy's attorneys, you're welcome to come out and look at whatever you want. And they said, no, we don't want to do that. And the board said, the administrative judge gave him the opportunity to explain why the agency wasn't doing enough in terms of discovery. And he said, as we point out in our brief, that he wasn't willing to do that either. He wasn't willing to explain to the board why he thought that the agency wasn't doing enough. So that's why the board found there weren't any discovery abuse rulings here because he didn't avail himself of the opportunities the administrative judge afforded him. If there are no further questions, we respectfully request that the court affirm the decision of the board. Thank you. Mr. Finnerstein, you have a little or a little time left. So the agency here is really falling on its sword on the idea that the decision was made before the disclosures. They're essentially not arguing that against our case that the reasons given were false, that things like being divisive and discordant are simply typical of what happens when you make a whistleblower disclosure. They're not non-retaliatory reasons. They're not arguing that there wasn't a strong motive to retaliate based on the disclosures or that there weren't similar situated people treated differently, but that it all doesn't matter just because Ruth decided before, which is a very shaky proposition. They claim that it's supported by Petz, Riera, and Brandt. Petz, in fact, testified that he met with Ruth one day and he was very angry and asked about removing McCarthy, but then later he wasn't so angry anymore and it appeared that he had changed his mind and that everybody was shocked. McCarthy was shocked, Ruth was shocked when he actually did it on the 31st. You don't mean Ruth was shocked. I'm sorry, McCarthy was shocked and Petz was shocked, who was in the room when he did it on the 31st. The perceived whistleblower matter, it's a legal argument, it's not a claim, but it's just a view of how the case law applies to the situation. It's not a separate claim that would have needed to be put before OSC. Let me ask you a question about Petz. You said Petz was so shocked. If Petz was so sure that Ruth really didn't mean it, then why did he feel like he had to go to McCarthy and warn him? He didn't warn him. He said, he went to him and he said, the commissioner's not very happy with you. I think you better work on having a better relationship with him. But his testimony was that the reason he did that was because he was so, because Ruth was so upset and so mad that he thought there was a very real possibility of a firing. So how is that consistent with him saying he was surprised? He said he was mad that day, but then when he saw him a few days later, he was calmed down and he wasn't talking about removal anymore. And I also wanted to point out that Ruth didn't even decide to remove McCarthy after the disclosures. When the disclosures were made on the 28th, he flew to Washington, D.C. to talk to the State Department about it. He went there and he testified to talk to the State Department about the disclosures and his desire to remove McCarthy. He wanted to find out and he brought that false, mistaken, whatever SS-50 with him and he said, look, he's a probationary. Can I just fire him based on his legal memos? It appears that he didn't even make the decision after the disclosures until he went and consulted with the State Department as to whether he could do it without cause. But with respect to that question of the probationer versus non-probationer, what's the difference legally between a probationer in the competitive service and an accepted service employee who's not in the preference eligible and is in the first two years? Well, this is something, admittedly, there's not a lot of case law about it, but we would contend that because McCarthy was a permanent employee, his correct SS-50 shows him as a permanent non-probationary employee. Now, it's true that until two years he doesn't have rights under Chapter 75 for that 30 days notice and so on, but because he is permanent and non-probationary, we argue that he has due process rights under the Constitution. Well, but there's a lot of law that says to the contrary on that. I mean, it wasn't discussed in the briefs, but Garrow against Graham, the D.C. Circuit case you may be familiar with, prior twist against the D.C. Circuit case, Fowler against the United States. I mean, it seems that that proposition, the due process proposition, has been pretty clearly rejected for people in that category. Well, even if it is rejected in terms of a property right, the expectation of continued employment, he does still have a liberty interest, and the Supreme Court has ruled that you can have a liberty interest even without a property. But you didn't raise that issue until the gray brief. I mean, you can't raise that issue on reply. Well, it's encompassed in our due process claim that which interest it comes under, property or liberty. We made a broad due process claim in the agency's reply brief. They did mention liberty, and I believe that this court has ruled even recently that when it's a constitutional issue, you don't have to strictly apply the rule that you can't raise something in a reply brief. Well, but to get back to the question that I asked as to the difference between a probationer and an accepted service non-preference eligible in the first two years, I suppose a probationer would have whatever rights the liberty interest would give would be available to the probationer just as much as to someone in Mr. McCarthy's position. But that once again leaves me wondering whether there's any difference between a probationer and competitive service and Mr. McCarthy. Well, you know, putting aside our argument about the due process, I don't think it really matters in this case because Mr. McCarthy's rights to appeal his removal came because he was a whistleblower. Probationers also have whistleblower rights. Of course, and so do probationers. But what it matters perhaps, too, is whether there's any consequence that is attached to this erroneous SF-50. Well, I think what matters there is that the agency believed that they would have a different process for removing him depending on whether he was probationary or not. And that's why they took this false... That's why Mr. Ruth took this false SF-50 to Washington and he testified. All we talked about when he went to the State Department to talk about this after the disclosures, all we talked about was the SF-50 and the probationary and at will because he believed that that was necessary for him to be able to remove McCarthy without cause and based on those legal memos that contained the same material as the protected disclosures. And so the agency, whether they were right or wrong, that it made a difference. They were using this incorrect document to bolster their case that they could get rid of McCarthy. One final question and then I'll leave you alone. Do you agree with Mr. Goodman that this is a disciplinary as opposed to a performance-based termination? You know, they claim they don't need cause, so it's really neither. Well, it's neither in the sense that he doesn't have Chapter 75 rights, we know that, but I'm interested in whether he would be in the category that would be covered by 75 if he did have... I mean, I would think that based on the letter that says he wasn't cooperative and collegial and he was divisive and so forth, that it was a conduct removal. Okay. Thank you. This seems to be going backwards. Do I have more time? No, no, you've used six minutes, actually, more than your allotted time. All right, well, I thank you very much for that. Very, very well. Thank you. And we thank both counsel. The case is submitted. All rise. The Honorable Court is adjourned. Thank you.